*In the Matter of Bernard Collins*, No. 591, September Term, 2018
Opinion by Deborah S. Eyler, J.


**WORKERS' COMPENSATION ACT - - RELEASE OF CLAIM - - DEATH BENEFITS.**

Bernard Collins suffered a work related occupational disease for which he filed a claim for workers' compensation with the Workers' Compensation Commission. His employer and its insurers contested the claim. Eventually the claim was settled by means of an agreement for immediate payment of disability benefits and long-term payment of certain medical expenses. The agreement included a Release. Peggy Collins, Mr. Collins's wife, was not a party to his claim and did not sign the Release.

Two years later Mr. Collins died of the occupational disease his claim was based on. Before the Commission, Mrs. Collins filed a claim for death benefits under the Workers' Compensation Act (Act). The Commission ruled that her claim was barred by the Release her husband had signed when he settled his claim. In an action for judicial review, the circuit court upheld the Commission's decision. This appeal followed.

*Held:* Judgment vacated and claim for death benefits remanded for further proceedings before the Commission. The Release did not bar Mrs. Collins's claim for death benefits.

When a worker who has suffered an accidental injury or occupational disease covered by the Act later dies of that injury or disease, his dependent(s) is entitled to pursue death benefits in conformity with the criteria required by the Act. The worker's claim for disability, medical, and vocational compensation is distinct and separate from his dependent's claim for death benefits. Although both the worker's claim and the dependent's claim arise out of an injury or disease of the worker that is compensable under the Act, they are separate and independent claims. The dependent's claim for death benefits is not derivative of the worker's claim for compensation.

Mrs. Collins's claim for death benefits arose when he died from his occupational disease; his death was the compensable event. Mr. Collins did not have the power to release his wife's death benefits claim, which was inchoate at the time he settled his own workers' compensation claim, only coming into fruition when he died of his occupational disease. Moreover, even if he did have the power to do so, which he did not, the language of the Release did not evidence an intention to do so.

Circuit Court for Calvert County
Case No. C-04-CV-17-000175

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 591

September Term, 2018

_____

IN THE MATTER OF BERNARD COLLINS

_____

Arthur,
Shaw Geter,
Eyler, Deborah S.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.
_____

Filed: August 2, 2019

*Gould, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On June 8, 2017, Bernard Collins, age 72, died of a heart attack brought on by heart disease and hypertension. He had worked for many years for the Huntingtown Volunteer Fire Department ("Huntingtown"), an appellee, as a volunteer firefighter. He had filed a claim with the Workers' Compensation Commission ("the Commission") against Huntingtown and two of its insurers, Chesapeake Employers Insurance Company ("Chesapeake") and Selective Insurance Company of America ("Selective"), also appellees, on the ground that his heart disease and hypertension were an occupational disease. That claim was settled.

The appellant in this case is Peggy Collins, Mr. Collins's widow. After her husband's death, she filed a claim in the Commission against the appellees for death benefits, alleging that his death resulted from his occupational disease. The Commission ruled that Mrs. Collins's claim was barred by the release of claims Mr. Collins had given in settling his own claim. In the Circuit Court for Calvert County, Mrs. Collins petitioned for judicial review of that decision. Cross-motions for summary judgment were filed and, after a hearing, the circuit court agreed with the Commission and granted summary judgment in favor of Huntingtown and the insurers.

Mrs. Collins noted this appeal, posing one question, which we have rephrased as follows:

> Did the release in the settlement agreement between Mr. Collins, Huntingtown, Chesapeake, and Selective operate to bar Mrs. Collins's claim for death benefits under the Workers' Compensation Act?

For the following reasons, we hold that the release did not bar Mrs. Collins's claim for death benefits. Accordingly, we shall reverse the judgment of the circuit court with

instructions to enter summary judgment in favor of Mrs. Collins and remand the case to the Commission for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS

The pertinent facts are undisputed. On February 13, 2012, Mr. Collins, then age 67,[1] filed a workers' compensation claim with the Commission, alleging that he had developed heart disease and hypertension caused by his firefighting work for Huntingtown. The Maryland Workers' Compensation Act ("the Act") creates a presumption of compensability for firefighters who develop heart disease and hypertension. *See* Md. Code (1999, 2008 Repl. Vol., 2011 Supp.), § 9-503(a) of the Labor and Employment Article ("LE"). Mr. Collins claimed that as of May 6, 2011, when Huntingtown was insured by Chesapeake, he became disabled due to his occupational disease.

Huntingtown and Chesapeake contested the claim. Chesapeake disputed the May 6, 2011 date of disablement, contending the correct date was December 12, 1998, when Mr. Collins underwent surgery for an aortic dissection. It successfully interpleaded Selective, which insured Huntingtown in 1998.

On March 19, 2014, following an evidentiary hearing, the Commission found that Mr. Collins had sustained an occupational disease (heart disease and hypertension), arising out of and in the course of his employment as a firefighter; that his last injurious

---

[1] In Mr. Collins's claim form, and in Mrs. Collins's later filed claim form, Mr. Collins's date of birth is listed as October 27, 194**4**. In the settlement agreement, it is listed as October 27, 194**3**. We use the date provided by the Collinses.

exposure was with Huntingtown; and that he was temporarily totally disabled as of May 6, 2011, for one day, and from July 7, 2011 through July 24, 2011. Later, the Commission found that Mr. Collins's average weekly wage was $152.50.[2]

In the Circuit Court for Calvert County, Huntingtown and Chesapeake filed petitions for judicial review of the Commission's decision. They both contested compensability generally and Chesapeake contested the Commission's finding that the date of last injurious exposure occurred in 2011. In a cross-petition, Mr. Collins disputed the calculation of his average weekly wage.

While the petitions were pending, Mr. Collins and the appellees agreed to settle the claim and filed a stipulation of dismissal in the circuit court, which on March 13, 2015, dismissed the case and remanded the matter to the Commission.

On May 14, 2015, Mr. Collins entered into an "Agreement of Final Compromise and Settlement" ("the Agreement") with Huntingtown, as employer, Chesapeake, as the insurer for Huntingtown, and Selective, as the "alleged insurer" of Huntingtown. After reciting the procedural background of Mr. Collins's claim, the Agreement provided that, as part of the settlement, the parties agreed that Mr. Collins's average weekly wage as of his date of disablement was $526.87; that Selective would pay him the lump sum of $100,000; and that Chesapeake would pay him the lump sum of $50,000 and fund a "Medicare Set Aside" annuity in the total amount of $47,192. The annuity would be

---

[2] Pursuant to Md. Code (1999, 2008 Repl. Vol., 2011 Supp.), section 9-602(g) of the Labor and Employment Article ("LE"), the average weekly wage of a volunteer firefighter may be computed based upon salary or wages from other employment.

funded with an initial lump sum payment of $9,438.08, followed by annual payments of $4,194.88 for nine years during Mr. Collins's lifetime. Huntingtown and Chesapeake further agreed to pay Mr. Collins's "causally related medical expenses" for "up to 45 days after the date [the Agreement was approved by the Commission], or until the initial [payment funding the Medicare Set-Aside was made], whichever date [came] first[.]" Mr. Collins otherwise released Huntingtown, Chesapeake, and Selective from any responsibility for medical expenses incurred beyond 45-days from the date the Agreement was approved by the Commission.

At Paragraph 11 of the Agreement, Mr. Collins, as "the Claimant," agreed to the following language of release ("the Release"):

> The Claimant hereby accepts this Agreement and the aforesaid payment(s) in final compromise and settlement of any and all Claims which the Claimant, his personal representative, dependents, spouse and children or any other parties who might become beneficiaries under the Workers' Compensation Law, might now or could hereafter have under the provision of the said Law, arising out of the aforesaid injury or disablement or the disability resulting therefrom, and does hereby, on behalf of himself and all of said other parties, release and forever discharge the Employer [Huntingtown], Chesapeake and Selective, their personal representative, heirs, successors and assigns, from all other claims of whatsoever kind which might or could hereafter arise under the Law from the said injury, disablement or disability.

The Agreement was signed by Mr. Collins, his attorney, and representatives of Huntingtown, Chesapeake, and Selective. It was filed with the Commission on May 19, 2015, along with a "Settlement Worksheet," a "Claimant's Affidavit in Support of Settlement," a "Medicare Set-Aside Allocation Recommendation" prepared by a third-party firm, a letter from the Centers for Medicare and Medicaid Services approving the

-4-

Medicare Set-Aside, and copies of medical bills for treatment Mr. Collins already had received. In the "Claimant's Affidavit," which must be submitted with a settlement agreement, Mr. Collins asked the Commission "to approve the settlement of [his] claim" and stated that he was "voluntarily settling [his] claim." He acknowledged that by doing so, he was giving up the right to future hearings before the Commission; to "vocational rehabilitation services and to payment during [his] lifetime for any medical treatment related to [his] claim, except as provided [in the Agreement]"; to compensation from the Subsequent Injury Fund, except as provided in the Agreement; to seek to reopen his claim if his condition worsened; and to appeal to the circuit court, this Court, or the Court of Appeals.

On June 4, 2015, the Commission approved the Agreement pursuant to LE section 9-722.

Just over two years later, Mr. Collins died from a cardiac arrest secondary to his heart disease and hypertension. On July 11, 2017, Mrs. Collins filed a "Dependent's Claim for Death Benefits" with the Commission, pursuant to LE sections 9-683.1 through 9-683.5. On the claim form, she gave May 6, 2011 as Mr. Collins's "Date of Injury" and $1,800 as his average weekly wage. She sought dependency benefits and reimbursement for Mr. Collins's funeral expenses.

The Commission held a hearing on Mrs. Collins's claim on September 7, 2017. The issues in dispute were whether the Release barred Mrs. Collins from receiving death benefits; Mr. Collins's date of disablement; his average weekly wage; and whether Mrs. Collins was partially or wholly dependent upon Mr. Collins when he became disabled.

By order of September 25, 2017, the Commission ruled that due to the Release, Mrs. Collins had "no[] right to survivorship/death benefits[,]" and denied the claim without reaching the other issues.

In the Circuit Court for Calvert County, Mrs. Collins filed a timely petition for judicial review and prayed a jury trial. Huntingtown and Chesapeake opposed the petition and moved for summary judgment on the issue of release.[3] Mrs. Collins opposed the motion and filed a cross-motion for summary judgment on that issue.

On May 1, 2018, after a hearing on the motions, the circuit court entered an opinion and order determining that the Release barred Mrs. Collins's claim, and granted summary judgment in favor of Huntingtown and Chesapeake. It subsequently entered an order clarifying that judgment also was granted in favor of Selective. This timely appeal followed.

## STANDARD OF REVIEW

As in any "typical administrative agency appeal . . . we . . . look through the circuit court judgment to review the decision of the Commission." *Stine v. Montgomery Cty.*, 237 Md. App. 374, 381 (2018). In so doing, we apply these guidelines:

> [A] decision of the Commission is "presumed to be prima facie correct." [LE] § 9–745(b)(1). . . . [W]e review a Commission decision only to determine whether the Commission "(1) justly considered all of the facts about the accidental personal injury . . . ; (2) exceeded the powers granted to it under this title; or (3) misconstrued law and facts applicable in the case decided." [LE] § 9–745(c). Indeed, "only upon a finding that its action was

---

[3] Selective did not move for summary judgment but, at the hearing on the motion, adopted the arguments raised by Huntingtown and Chesapeake.

based upon an erroneous construction of the law or facts" will we reverse a Commission ruling. *Frank v. Baltimore County*, 284 Md. 655, 658 (1979). In other words, "[n]otwithstanding the deferential treatment of the Commission's decision, a reviewing court has broad authority and may reverse the Commission's decision when it is based on an erroneous conception of the law." *Board of County Comm'rs v. Vache*, 349 Md. 526, 533 (1998).

*Mona Elec. Servs., Inc. v. Shelton*, 148 Md. App. 1, 5 (2002), *aff'd* 377 Md. 320 (2003).

## DISCUSSION

### A.

The legislative purpose of the Act is "to provide employees with compensation for loss of earning capacity, regardless of fault, resulting from accidental injury, disease, or death occurring in the course of employment." *DeBusk v. Johns Hopkins Hosp.*, 342 Md. 432, 437 (1996). The Act "strikes an important balance between the need to provide some form of financial benefits to injured or sick employees and the need, of both employers *and* employees, to avoid expensive and unpredictable litigation over accidents in the workplace." *Id*. at 438 (emphasis in original) (citing Richard P. Gilbert & Robert L. Humphreys, Jr., *Maryland Workers' Compensation Handbook* §§ 1.0-1.2 (2d ed. 1993 & Supp.1996)). Because the Act is remedial legislation, it must be "construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes." *Johnson v. Mayor & City Council of Baltimore*, 430 Md. 368, 377 (2013) (citations omitted).

The Act imposes liability on employers and/or insurers to compensate employees, during their lifetime, for medical expenses resulting from work-related injuries or disease, and to "provide a measure of compensation for lost wages or loss of earning

capacity[.]" Richard P. Gilbert, Robert L. Humphreys, Jr., et al., *Maryland Workers' Compensation Handbook* § 9.01 (4th ed. 2013 & 2018 Supp.) (hereinafter "*Gilbert*"). As we shall discuss below, if a "worker dies *as a result of* an accidental injury or occupational disease, the death is a separate compensable event" and any dependents "are entitled to recover, as of the date of death, the death benefits." Theodore B. Cornblatt, et al., *Maryland Workers' Compensation Manual* 29 (18th ed. 2017) (emphasis added).

Subtitle 6 of the Act, governing "Benefits," is divided into thirteen parts. Parts II through V establish categories of disability compensation benefits for the injured worker: temporary partial disability (Part II); temporary total disability (Part III); permanent partial disability (Part IV); and permanent total disability (Part V). *See* LE §§ 9-614 – 9-640; *Gilbert*, § 9.03. Parts IV and V each include a "Survival of compensation" provision. Those provisions state that if a worker dies of a cause *unrelated* to his workplace injury or disease when permanent disability benefits awarded still remain payable, the right to those benefits "survives to the surviving dependents" of the worker. LE §§ 9-632 & 9-640.

Part IX governs medical benefits, which, unlike most disability benefits, are not time-limited and have no maximum cap. *See* LE §§ 9-660 – 9-664; *see also Gilbert* § 9.01[2].

Part XII governs death benefits. As pertinent, it provides that if there are "individuals who were dependent on a deceased covered employee at the time of death resulting from an accidental personal injury or occupational disease, the employer or its insurer shall pay death benefits . . . ." LE § 9-683.3(b). The amount of the death benefits

payable to the dependents of a deceased worker is calculated based upon the average weekly wage of the worker as of the date of the accidental injury or, in the case of an occupational disease, the date of the last injurious exposure, as a percentage of the family income of the worker's dependents. LE § 9-683(c). Benefits "shall be paid for a minimum of 5 years after the covered employee's death" and, if that minimum has been met, otherwise terminate on what would have been the deceased worker's 70th birthday, unless certain exceptions are met. LE §§ 9-683(d) & (e). Finally, Part XIII requires an employer or its insurer to pay "reasonable funeral expenses of a deceased covered employee" not to exceed $7,000 if the employee died as a result of an accidental injury (within 7 years) or from an occupational disease. LE § 9-689.

Subtitle 7 of the Act sets forth the procedures for filing and adjudicating claims. Two provisions are pertinent to this appeal. Under LE section 9-711(a)(1), a dependent of a deceased covered worker is the appropriate claimant in an application for death benefits. *See also* COMAR 14.09.01.01B(3)("'Claimant' means a person filing a workers' compensation claim and includes: . . . (b) A dependent of a deceased covered employee").

LE section 9-722, entitled "Claim Settlement," provides that

[s]ubject to approval by the Commission . . . after a claim has been filed by a covered employee or the dependents of a covered employee, the covered employee or dependents may enter into an agreement for the final compromise and settlement of any current or future claim under this title with:
(1) the employer;
(2) the insurer of the employer;
(3) the Subsequent Injury Fund; or
(4) the Uninsured Employers' Fund.

-9-

LE § 9-722(a).

A settlement agreement "shall contain the terms and conditions that the Commission considers proper." LE § 9-722(b). It only is effective if approved by the Commission. *Id*. at (c). Once approved, it "is binding on all of the parties to the agreement." *Id*. at (d)(1). "If an individual entitled to payment under a final compromise and settlement agreement dies before the individual receives the total amount payable, the balance payable is an asset of the estate of the individual." *Id*. at (e).

**B**.

*Sea Gull Specialty Co. v. Snyder*, 151 Md. 78 (1926), is the seminal case construing the death benefits provisions of the Act. There, the Court of Appeals considered whether the Commission (then known as the State Industrial Accident Commission) erred in calculating the death benefits payable to the widow of a covered worker. The worker suffered an accidental injury and had received temporary total disability compensation. He later died from his injury, and his widow filed a claim for death benefits. The worker's employer acknowledged that the widow was entitled to death benefits but argued that the amount of her benefits should be reduced by the amount of temporary total disability benefits paid to her husband during his lifetime. The Commission rejected that argument and awarded the widow full death benefits.

Relying upon the plain language of the statutes governing disability and death benefits under the Act, the Court of Appeals upheld the Commission's decision. At that time, the Act provided that if a compensable injury caused death within three years,

"wholly dependent persons at the time of death" were entitled to death benefits in the amount of two-thirds of the decedent's average weekly wage, but not less than $8 per week and not more than $18 per week, for a period of 8 years up to a maximum total payment of $5,000. *Id*. at 82-83. The Court held that the Act "created two separate and distinct classes of persons to whom compensation might be awarded: first, the injured employee; and second, in case of his death within the period specified, his dependents." *Id*. at 84. The Court explained that a dependent's entitlement to death benefits was "in no wise made dependent upon compensation having been already awarded to the injured party." *Id*. Rather, the applicant need only be "a dependent within the meaning of the law" and the injury need only be one that "the deceased party would have been entitled to compensation for, had he lived[.]" *Id.* The Court emphasized that although the "right to an award of compensation in each of these cases arises out of the same compensable injury, . . . the class of compensation awarded the injured employee and that awarded his dependents in case of his death, are separate and independent of each other." *Id*. It opined:

> Compensation for the death is payable to and belongs to the dependent, while compensation awarded to the living employee is payable and belongs to him. . . . In other words, the Legislature has said to the employee: "If you are injured under the conditions provided, you are entitled to the definite compensation fixed by the law." Having said this, they then say to the dependents of the deceased injured employee: "If the employee died within three years as a result of the injury, your dependents are entitled to compensation."

*Id*. at 85.

In *Di Pietro v. Mayor and City Council of Baltimore*, 179 Md. 220 (1941), the Court applied this concept to hold that the Commission's final adjudication of the issue of compensability of a worker's injury, made during the worker's lifetime, was *res judicata* on that issue in a claim for death benefits made after his death. As the Court explained it, although a dependent's claim for death benefits after the worker's death is independent of the worker's claim for compensation during his lifetime, the existence of an injury that is compensable under the Act is a necessary prerequisite to both claims, and whether the worker suffered a compensable injury is an issue that only may be adjudicated on the merits once. On that basis, the Court affirmed the Commission's decision to dismiss a widow's claim for death benefits because, during her deceased husband's lifetime, the Commission had disallowed his claim for disability benefits, finding that his disability was not caused by a workplace accident. In her later claim for death benefits, the widow was bound by the earlier final adjudication of that issue.

The independence of a worker's claim for compensation benefits from his dependent's claim for death benefits was again central in *Cline v. Mayor and City Council of Baltimore*, 13 Md. App. 337 (1971), *aff'd* 266 Md. 42 (1972) (*per curiam*).[4] In that case, a worker suffered an accidental work injury and died two months later. The day before he died, an amendment to the Act increasing the death benefits payable went into effect. The issue on appeal was whether, in her death benefits claim, the worker's

_____

[4]This Court's opinion in *Cline* was authored by then Chief Judge Robert C. Murphy. The Court of Appeals adopted that opinion.

widow was entitled to the amount of the death benefits at the time of her husband's injury or to the higher amount of the death benefits at the time of his death. The Commission and the circuit court had ruled that the widow was "limited in her recovery to the amount of death benefits provided by the statute in force at the time of the injury[.]" *Id*. at 340.

This Court reversed. We explained that a dependent of a deceased worker may have one of two types of claims under the Act. If the worker did not die from his compensable injury, but from some other cause, *and*, at the time of his death, there were unpaid permanent disability benefits, then the dependent was entitled to make a claim for the unpaid benefits that survived under the Act. Alternatively, if the worker died from his compensable injury, the dependent was entitled to make a claim for death benefits. In the former scenario, "it is not the death that is compensable . . . but rather the injury" and the dependent "take[s] under [the worker], and not independently." *Id*. In the latter scenario, although the dependent's claim

> arises out of the compensable injury, *it is the employee's death itself which is the compensable event,* and the right of the surviving dependents to death benefits is separate and independent of the injured employee's rights and does not depend upon whether compensation was paid to the injured workman during his lifetime.

*Id*. at 340-41 (emphasis added) (citing *Seagull*, 151 Md. at 78). We reasoned that because "the dependent's right to death benefits is an independent right derived from statute, and not from the rights of the decedent[,]" *id*. at 341, the amount of death benefits payable to a dependent under the Act must be determined from the schedule in effect when the worker died, not from the schedule in effect when the worker was injured. We observed that our reasoning on this issue was validated by decisions of other state courts

concluding that a claim for workers' compensation death benefits "does not accrue during the workman's lifetime" and that the "obligations and rights of the parties [vis-à-vis death benefits] do not become fixed until the employee's death." *Id.*

### C.

Mrs. Collins contends the Commission (and the circuit court) erred by construing the Release to bar her claim for death benefits, for several interrelated reasons. First, relying upon the cases discussed above, she argues that, under the Act, a dependent's claim for death benefits is independent and not derivative of the worker's claim for compensation benefits, and, consequently, the worker may not contract away the dependent's death benefits claim. Accordingly, Mr. Collins did not have the power to release her death benefits claim in his case. Second, because she was not a signatory to the Agreement, and indeed was not a party to her husband's case, the Release in the Agreement did not and could not have had the effect of barring her from bringing a claim for death benefits. Finally, even if Mr. Collins could have released her death benefits claim, the language of the Release did not evidence an intent on his part to do so.

Huntingtown, Chesapeake, and Selective respond that the language of the Release is clear and unambiguous and plainly bars Mrs. Collins's death benefits claim because it releases liability for "all other claims of whatsoever kind which might or *could hereafter* arise" from Mr. Collins's occupational disease. (Emphasis added.) They maintain that a claim for death benefits is wholly derivative of the worker's claim for disability because it arises from the worker's compensable work-related injury or disease; therefore, it is barred by the plain language of the Release. Furthermore, they argue that because LE

-14-

section 9-722(a) permits a "covered employee *or dependents*" to "enter into an agreement for the final compromise and settlement of any current *or future claim*," Mr. Collins was statutorily authorized to compromise Mrs. Collins's potential future death benefits claim and to bind her to the terms of the Agreement, even though she was not a signatory. Chesapeake and Selective also find support in *State ex. rel. Melitch v. United Railways & Electric Company*, 121 Md. 457 (1913), which held that a wrongful death beneficiary's cause of action was barred by the decedent's settlement and release of his personal injury claim during his lifetime.

**D.**

The controlling case law and unambiguous language of the Act lead us to conclude that, if we assume for the sake of argument that the language of the Release can be construed to give up a future claim by Mrs. Collins for death benefits, the Release was ineffective to do so. We explain.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Id*. at 275.

In *Seagull*, *Di Pietro*, and *Cline*, the Court of Appeals and this Court concluded that the pertinent language of the Act is unambiguous and clearly creates two separate classes of compensation benefits: 1) disability, medical, and vocational rehabilitation benefits that belong to the injured worker and compensate him for loss of income and

-15-

other costs associated with his injury or disease; and 2) death benefits that belong to the dependents of the injured worker and compensate them for his death. The latter class of benefits arises from a compensable injury or disease suffered by a worker during his lifetime but is not derivative of the injured worker's claim for benefits. Rather, a claim for death benefits is distinct from a claim for benefits by a worker during his life. It is brought on behalf of the dependent as claimant and the amount of benefits awarded is calculated based upon the degree of dependency, not based upon the extent of the injury or the length of time that the covered worker was disabled.

When a covered worker suffers a compensable accidental injury or develops an occupational disease, his dependents' entitlement to death benefits is inchoate, as it is not certain ever to accrue. If the injured worker dies of a cause unrelated to the workplace injury or disease, the potential claim for death benefits is extinguished, although a dependent of the worker may be entitled to unpaid disability benefits under the survival provisions of the Act. (Likewise, a dependent of the worker may die before the worker dies). If the worker dies from the compensable injury or disease and leaves a dependent, however, the death benefits claim becomes choate. In that situation, the employer or insurer "shall pay death benefits" upon a showing of total or partial dependency at the time of the accidental injury or last injurious exposure. LE § 9-683.3(b).

Although the law is well settled as to the separate and distinct nature of compensation and death benefits, there are no Maryland appellate cases that have addressed the issue in this case: whether a worker who settles his claim during his

-16-

lifetime may unilaterally on behalf of his dependents release their independent contingent right to claim death benefits.

To answer this question, we begin with LE section 9-722, the "Claim settlement" provision of the Act, and the regulations promulgated under it. LE section 9-722(a) states that "*after a claim has been filed* by a covered employee *or* the dependents of a covered employee," a worker *or* his dependents may "enter into an agreement for the final compromise and settlement of any current or future claim under [the Act.]" (Emphasis added.) If approved by the Commission, that agreement "is binding on all of the parties to the agreement." LE § 9-722(d)(1).

COMAR 14.09.10.02, governing "Agreements for Final Compromise and Settlement[,]" sets out at Section A the terms and conditions that must be included in any settlement agreement filed with the Commission. These include the total settlement amount, the date payment will commence, any past compensation paid, the worker's average weekly wage, and the date of disablement. Section A requires that the "Settlement Worksheet" form be completed and attached to the agreement.[5] COMAR 14.09.10.02A.(13). Section B pertains to future medical expenses and governs Medicare set-aside agreements. Section C governs "Special Requirements" and, as pertinent, at subsection C(2), addresses "Dependency Claims." Under that provision, "[w]hen the

_____

[5]The regulation does not require that the form Affidavit be attached to a settlement agreement, but the Commission's website states that the affidavit is 'Required for ALL settlements." *See* https://www.wcc.state.md.us/Adjud_Claims/Forms.html#settlement (last visited July 02, 2019).

settlement arises in connection with a claim involving a surviving dependent, the agreement submitted to the Commission for approval, in addition to complying with §§A and B, shall contain" certain enumerated information and attachments, including a death certificate and, "if the claimant is a surviving spouse, a marriage certificate." The language of this regulation thus presumes that a settlement of a dependent's claim for death benefits will arise in the context of a claim brought by the dependent after the worker's death, not in the context of the worker's claim for disability benefits during his lifetime.

We read LE section 9-722, together with the regulation, to mean that after a worker files a claim for disability, medical, and vocational rehabilitation benefits, he may enter into an agreement to settle that claim, subject to approval by the Commission. In doing so, the worker may settle *his own* future claims arising from a worsening of his condition *and* may extinguish a potential claim by a surviving dependent under the "Survival of compensation" provisions of the Act, *see* LE sections 9-632 and 9-640, by which the dependent "take[s] under [the worker]." *Cline*, 13 Md. App. at 340. Likewise, after a dependent of a deceased covered worker files a claim for death benefits, he may settle that claim with the deceased worker's employer or insurer. LE section 9-722 does not contemplate a covered worker settling and releasing his dependent's inchoate claim for death benefits within the settlement of his claim for benefits to which he is entitled during his life.

This construction is consistent with the benevolent purpose of the settlement oversight requirement, which "is to prevent advantage being taken of a claimant's

possible ignorance of his rights or of his best interests." *Hanley v. Mulleneaux*, 192 Md. 592, 597 (1949); *see also B. Frank Joy Co. v. Isaac*, 333 Md. 628, 643 (1994) (the Commission's "broad supervisory authority over compromise and settlement agreements" serves as a "bulwark between innocent but ignorant claimants and illusory or woefully inadequate compromises") (citation omitted). The uncertainty surrounding death benefits during a worker's lifetime could lead to compromises that fail to adequately compensate dependents.

In the case at bar, there was one claimant in the case that was settled - - Mr. Collins - - and he was the only person who signed the Agreement, other than those representing the employer and insurers. Mrs. Collins was not a party to her husband's workers' compensation case, did not sign the Agreement that includes the Release, and there is no suggestion that she participated in negotiating the Agreement. The Agreement, including the Release, was not enforceable against her for the additional reason that LE section 9-722(d) makes settlement agreements binding only upon the parties to it. This is consistent with the well-established principle of contract law that a contract is binding "only upon the parties to the contract and their privies." *Homeseekers' Realty Co. v. Silent Automatic Sales Corp.*, 163 Md. 541, 545 (1933); *see also Crane Ice Cream, Co. v. Terminal Freezing & Heating Co.*, 147 Md. 588, 593 (1925) ("It may be stated as a general rule that a contract cannot be enforced by or against a person who is not a party to it"). Thus, even if Mrs. Collins could have joined in the Agreement and released her future claim to death benefits, Mr. Collins could not

unilaterally contract away her independent statutory right to pursue a potential claim for death benefits.

The Court of Appeals' decision in *Melitch*, 121 Md. at 457, does not alter our conclusion. *Melitch* was decided under the Wrongful Death Act. Although a wrongful death action bears some similarity to a Workers' Compensation Act claim for death benefits, in that it is a "new and independent cause of action, distinguishable from a decedent's own personal injury action during his or her lifetime, or a survival action," *Spangler v. McQuitty*, 449 Md. 33, 54 (2016) (footnote omitted) (*McQuitty III*), the statutes governing them differ in significant respects. Under the Wrongful Death Act, a beneficiary may bring an action for damages against a person "whose wrongful act causes the death of another[,]" Md. Code (1974, 2013 Repl. Vol.), § 3-902(a) of the Courts & Judicial Proceedings Article ("CJP"); and a wrongful act is "an act, neglect, or default . . . which would have entitled the party injured to maintain an action and recover damages if death had not ensued." CJP § 3-901(e). The Court of Appeals has found the "if death had not ensued" language to be ambiguous and has grappled with its meaning. *See, e.g., Mummert v. Alizadeh*, 435 Md. 207 (2013) (holding that defenses that go to the viability of the injured person's cause of action from the outset are equally applicable to bar a wrongful death action premised on the same injury). No such language or ambiguity appears in the death benefits provisions of the Act.

It was the ambiguous language of the Wrongful Death Act that undergirded the Court's holding in *Melitch* that an injured party's agreement, in exchange for "a valuable consideration," to release a defendant "from all and every claim and demand which he

might or could possibly have for or on account of his injuries[,]" barred his widow from suing for his wrongful death after he died as a result of that injury. 121 Md. at 458. After examining cases from other jurisdictions interpreting the same or similar statutory language, the *Melitch* Court reasoned "that liability of the wrongdoer exists where the deceased could have recovered if death had not ensued[]" which "clearly exclude[d] the idea that where the decedent receives satisfaction for his injuries, the condition requisite to the right of surviving relatives may exist notwithstanding."[6] *Id*. at 460. The Court thus held that because the husband's release of his claim would have "precluded him from recovering 'if death had not ensued,'" that release likewise barred the widow's claim. *Id*. at 459.

The same result does not follow under the Workers' Compensation Act. The Wrongful Death Act creates a cause of action in favor of certain surviving relatives of a deceased person. The Workers' Compensation Act establishes a statutory entitlement to benefits in favor of the dependents of a covered worker. If the statutory criteria are met, the benefits "shall be paid." LE § 9-683.3 The language of LE section 9-683.3 is

---

[6] In *McQuitty III*, 449 Md. at 57, the Court held that a judgment entered in favor of an injured child during his lifetime did not bar a wrongful death action brought by his parents after his death from his injuries. The Court recognized that its holding was inconsistent with some of the language in *Melitch*, but, characterizing that language as *dicta*, did not overrule it. *Id*. And in *Mummert*, the Court made clear that a release executed during an injured person's lifetime is not an absolute bar to a subsequent wrongful death action following his death. 435 Md. at 221 ("Moreover, in our view, whether a release by the decedent bars a wrongful death claim by her beneficiaries depends in part on the sweep of the language of the particular release.").

unambiguous and does not make the liability of an employer or insurer to pay death benefits to dependents of a covered worker who dies from a compensable injury contingent upon the covered worker having not released his separate claim for disability benefits during his lifetime.[7]

## E.

Even if Mr. Collins could have unilaterally released Mrs. Collins's claim for death benefits, which we have held he could not, the language of the Release does not evince a clear intent on his part to do so. "Releases are contractual, and they are therefore governed by ordinary contract principles." *Chicago Title Ins. Co. v. Lumberman's Mut. Cas. Co.*, 120 Md. App. 538, 548 (1998). Thus, our primary task is to "ascertain and

---

[7] Although not binding upon us, we note that many state courts have held that the release of a covered worker's claims for lifetime benefits has no bearing upon a dependent's claim for death benefits under parallel provisions of those states' workers' compensation statutes. *See* Larson, Arthur, *et al.*, *Larson's Workers' Compensation Law* § 98.01[2] (2018) (Stating that "[t]he settlement, compromise, or release by the deceased of his or her rights under the Act cannot bar the statutory rights of any dependents, since these rights are independently created by statute" and citing cases); *Family Dollar v. Baytos*, 525 S.W.3d 65 (Ky. 2017) (holding that a deceased covered worker's release of any and all claims he might have under the Kentucky Workers' Compensation Act in exchange for a lump sum payment did not affect his widow's claim for death benefits after he died as a result of his compensable injury); *Kibble v. Weeks Dredging & Constr. Co.*, 735 A.2d 1142, 1146 (N.J. 1999) (noting that courts in the "the vast majority of states [have held that] a dependent's right to seek worker[s'] compensation death benefits is not affected by a lump-sum settlement agreement between an injured worker and that worker's employer" and holding that a spouse or other dependent of covered worker must knowingly, intelligently, and voluntarily waive their right to future dependency claims in connection with a lump-sum settlement in order for it to bind them); *Buchanan v. Kerr-McGee Corp.*, 908 P.2d 242, 245 (N.M. Ct. App. 1995) (holding "in accord with the great weight of authority from other jurisdictions" a "unilateral settlement or release by a worker of his or her own claims does not bar the surviving dependent's claim even if the release signed by the worker explicitly purports to release the dependent's claim").

effectuate the intention of the parties[.]" *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'Ship*, 109 Md. App. 217, 290 (1996). We look to the language of the contract to determine the parties' intent and, if the language is unambiguous, "we give effect to its plain meaning and do not delve into what the parties may have subjectively intended." *Schneider Elec. Bldgs. Critical Sys., Inc. v. W. Sur. Co.*, 454 Md. 698, 706 (2017) (citation omitted).

The Release is made on behalf of "the Claimant," *i.e.*, Mr. Collins. He agrees, in consideration for the payment of $150,000 and the Medicare Set-Aside annuity, to a "final compromise and settlement of any and all Claims which [he], his personal representative, dependents, spouse and children or any other parties who might become beneficiaries under [the Act] might now or could hereafter have under the [Act], arising out of [his heart disease and hypertension] or the disability resulting therefrom[.]" He further agrees, "on behalf of himself and all of said other parties, [to] release and forever discharge the Employer, Chesapeake and Selective . . . , from all other claims of whatsoever kind which might or could hereafter arise under Law from the said injury, disablement or disability."

Notably missing from the language of the Release is any mention of death resulting from Mr. Collins's covered injury or any future claim for death benefits under the Act. Although Mr. Collins purports to release future claims that could "arise" from his occupational disease, as we have discussed, a claim for death benefits accrues and arises from a covered worker's *death from the disease (or injury)*, not from the disease (or injury) itself. Given Mr. Collins's age and medical condition, the possibility that he

would die from the heart disease and hypertension he was presumed to have contracted from his work as a firefighter would have been evident to the parties to his workers' compensation case. The failure to specify that claims accruing if Mr. Collins were to die because of his compensable occupational disease were being released by him on behalf of his dependents evinces that the parties did not intend the Release to extend to those claims.

For all these reasons, the Commission and the circuit court erred as a matter of law in ruling that the Release barred Mrs. Collins from recovering death benefits under the Act. Accordingly, we shall reverse the circuit court's summary judgment in favor of the appellees and remand this case to the circuit court to enter summary judgment in favor of Mrs. Collins and to remand the case to the Commission for further proceedings, not inconsistent with this opinion, on her claim for death benefits.

**JUDGMENT OF THE CIRCUIT COURT FOR CALVERT COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO ENTER JUDGMENT IN FAVOR OF THE APPELLANT AND TO REMAND THE CASE TO THE WORKERS' COMPENSATION COMMISSION FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES.**